UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ATLAS DATA PRIVACY CORPORATION, et al., Plaintiffs, | |
| v. | Civ. Action No. 1:25-cv-17065 (HB) |
| KLEISSNER INVESTMENTS S.R.O., et al., Defendants. | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

**PEM LAW LLP**
Rajiv D. Parikh (032462005)
Kathleen Barnett Einhorn (040161992)
Jessica A. Merejo (288592020)
1 Boland Drive, Suite 101
West Orange, New Jersey 07502
Telephone: (973) 577-5500
Facsimile: (973) 860-4433

**FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP**
Rahul Agarwal, Esq. (365832024)
Diana A. Arsanjani Reisman (*pro hac vice*)
1 Gateway Center, 25th Floor
Newark, New Jersey 07102
Telephone: (973) 877-6400

***Of Counsel and on the Brief:***
Rahul Agarwal, Esq. (365832024)
Diana A. Arsanjani Reisman (*pro hac vice*)

Dated: August 6, 2026

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................ ii

PRELIMINARY STATEMENT ........................................ 1

STATEMENT OF FACTS FROM DISCOVERY ........................................ 2

A. Defendant Has Ongoing Customer Relationships in New Jersey ........................................ 2

B. Defendant Engaged a New Jersey Reseller to Sell Its Products ........................................ 3

C. Defendant Deliberately Collected and Curated U.S. and New Jersey Data ........................................ 5

D. Defendant Pays a Third Party for Contact-Information Data ........................................ 7

ARGUMENT ........................................ 7

I. THE COURT HAS SPECIFIC PERSONAL JURISDICTION OVER DEFENDANT ........................................ 7

A. Defendant Purposefully Availed Itself of New Jersey ........................................ 8

B. Plaintiffs' Claims Arise Out of or Relate to Defendant's Forum Contacts ........................................ 14

C. Exercising Jurisdiction Would Not Offend Traditional Notions of Fair Play and Substantial Justice ........................................ 14

CONCLUSION ........................................ 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Ameripay, LLC v. Ameripay Payroll, Ltd.,
334 F. Supp. 2d 629 (D.N.J. 2004) ....... 8, 14

Atlas Data Priv. Corp. v. Constella Intelligence, Inc.,
No. ESX-L-7212-24, Tr. I.D. LCV20261285271 (Law Div. May 12, 2026)....... 15

Atlas Data Privacy Corp. v. Quantarium Alliance, LLC,
No. 24-11023, 2026 WL 765716 (D.N.J. Mar. 18, 2026) ....... *passim*

Burger King Corp. v. Rudzewicz,
471 U.S. 462 (1985)....... 10, 13

Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.,
592 U.S. 351 (2021)....... 7, 8

Hasson v. FullStory, Inc.,
114 F.4th 181 (3d Cir. 2024) ....... 14

Kratovil v. City of New Brunswick,
261 N.J. 1, 336 A.3d 201 (2025)....... 15

Mellon Bank (East) PSFS v. Farino,
960 F.2d 1217 (3d Cir. 1992)....... 8

Toys "R" Us, Inc. v. Step Two, S.A.,
318 F.3d 446 (3d Cir. 2003)....... 13, 14

Venuto v. Atlantis Motor Group, LLC,
CV 17-3363, 2018 WL 2134035 (D.N.J. May 9, 2018) ....... 8

World-Wide Volkswagen Corp. v. Woodson,
444 U.S. 286 (1980)....... 8

**Statutes**

N.J.S.A. § 56:8-166.1....... *passim*

## PRELIMINARY STATEMENT

The jurisdictional question here is straightforward. In Atlas Data Privacy Corp. v. Quantarium Alliance, LLC, No. 24-11023, 2026 WL 765716 (D.N.J. Mar. 18, 2026), this Court exercised personal jurisdiction over data brokers that deliberately collected, organized, or monetized access to personal data—including the data of New Jersey residents—through products sold to paying New Jersey customers. Defendant falls squarely within that camp.

Jurisdictional discovery confirmed what Plaintiffs argued from the outset. The record establishes that Defendant: (1) knowingly gathered and organized U.S. data—which includes the home addresses and phone numbers of New Jersey residents—through buckets built for .us and .gov domains; (2) paid a third-party vendor approximately $50 per month for aggregated WHOIS data that includes contact-information fields such as home addresses and telephone numbers; (3) maintained a website through which users can purchase access to the personal information of New Jersey residents, and that website is accessible to customers in New Jersey; (4) had three paying end-user customers in New Jersey that generated approximately [redacted] in license fees in 2024 and 2025; and (5) sold licenses to [redacted], a major global IT solutions provider headquartered in [redacted], New Jersey, generating approximately [redacted] in revenue in 2024 and 2025. These are not the incidental contacts of a passive website operator. They are the deliberate, commercially motivated acts of a data broker that organized and monetized U.S. and New Jersey data, sold licenses to a New Jersey-based reseller, and sold paid access directly to that New Jersey data to New Jersey customers.

Quantarium Alliance supplies the governing standard.[1] The discovery record satisfies it. The Court should deny Defendant's motion to dismiss for lack of personal jurisdiction.

## STATEMENT OF FACTS FROM DISCOVERY

### A. Defendant Has Ongoing Customer Relationships in New Jersey

Jurisdictional discovery revealed what Defendant's pre-discovery submissions obscured: when Plaintiffs filed the Complaint on April 30, 2025, Defendant maintained three licensed end-user customer relationships with New Jersey entities. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 2.) These were not anonymous website visits or one-off searches by unknown users. They were paid license relationships for Defendant's data products, including annual subscriptions that were renewed, expanded, or maintained over time.

***First***, [redacted] has maintained a paid IntelX account since January 2, 2023. Id. During the discovery period, [redacted] paid Defendant licensing fees of [redacted] in 2024 and [redacted] in 2025. Id. Defendant's corporate representative testified that Kleissner Investments identified [redacted] as a New Jersey end-user customer based on its New Jersey billing address. Agarwal Cert. Ex. B (Holcomb Dep. Tr.), at 81:2–11. The relationship began years before this suit and resulted in multiple paid licenses during the relevant period. Id. at 81:12-17.

***Second***, [redacted] has maintained an IntelX account since December 2, 2020, and first purchased an IntelX license

---

[1] While Plaintiffs apply the Quantarium Alliance framework here, they preserve their arguments as to whether the Calder effects test likewise confers personal jurisdiction.

on June 10, 2021. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 2.) During the discovery period, [redacted] paid licensing fees of [redacted] in 2024 and [redacted] in 2025. Id. Defendant's corporate representative testified that [redacted] provided a New Jersey billing address, and that this billing address was the basis for identifying the firm as a New Jersey end-user customer. Agarwal Cert. Ex. B (Holcomb Dep. Tr.), at 88:21–89:6. Defendant maintained and renewed a paid licensing relationship with this New Jersey-based customer for several years before suit and throughout the relevant discovery period.

***Third***, [redacted] has maintained an IntelX account since July 28, 2022. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 2.) During the discovery period, [redacted] paid Defendant licensing fees of [redacted]. Id. Defendant's corporate representative confirmed that [redacted] was identified as a New Jersey end-user customer based on its New Jersey billing address. Agarwal Cert. Ex. B (Holcomb Dep. Tr.), at 89:7-13. Defendant's interrogatory response identifies a paid licensing relationship with a New Jersey end-user customer that began several years before suit and continued through the filing of the Complaint. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 2.)

Together, these three New Jersey customers paid Defendant approximately [redacted] in license fees in 2024 and 2025—and more in the years leading up.

### B. Defendant Engaged a New Jersey Reseller to Sell Its Products

Jurisdictional discovery also revealed a separate and significant New Jersey contact: Defendant chose to enter into a reseller relationship with [redacted], a major global IT solutions provider headquartered in [redacted], New Jersey, to sell IntelX products in 2024 and 2025. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 2.) Unlike a mere affiliate arrangement directing customers to a website, Defendant's corporate representative confirmed that

[redacted] itself purchased licenses directly from Defendant and paid the fees associated with those licenses. Agarwal Cert. Ex. B (Holcomb Dep. Tr.), at 96:13–98:17. The payment structure was direct: "[redacted] pays Kleissner Investments directly for the licenses that it then resells." Id. at 97:25–98:2. Through this New Jersey-based sales channel, Defendant earned approximately [redacted] in 2024 and [redacted] in 2025—a total of approximately [redacted] flowing through the State of New Jersey. Id. at 100:3-15. Defendant asserts that [redacted]'s downstream customers in 2024 and 2025 were not located in New Jersey. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 2.) But the forum contact is Defendant's decision to route sales of the very product at issue through a New Jersey reseller that paid Defendant directly.

Notably, [redacted] paid Defendant the same license fees that direct customers pay through the website. Agarwal Cert. Ex. B (Holcomb Dep. Tr.), at 98:14–17. This was not a discounted wholesale arrangement or an arms-length referral program—[redacted] paid full price for each license and then resold it. The economic relationship was a straightforward sale: Defendant sold licenses to [redacted], [redacted] paid Defendant directly, and Defendant earned substantial revenue from a New Jersey company.

Defendant's awareness of its New Jersey forum contact is confirmed by the terms of the [redacted] licenses themselves. Defendant's corporate representative testified that the licenses Defendant sold to [redacted] explicitly stated that the end user is outside of New Jersey. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 2.) This was not boilerplate. The corporate representative confirmed it was "an agreed term" that "a term that Kleissner Investments had negotiated to make explicit." Agarwal Cert. Ex. B (Holcomb Dep. Tr.), at 101:2-9. When asked whether Defendant's other resellers had similar New Jersey-specific restrictions, the answer was: "Not to my knowledge." Id. at 102:6–11.

### C. Defendant Deliberately Collected and Curated U.S. and New Jersey Data

Jurisdictional discovery also showed that IntelX is not a passive, Google-like index of the public internet. Defendant's architecture is built around "Buckets"—source categories Defendant created to index the data in its system. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 6.) That architecture shows that Defendant knew what kinds of data it possessed, organized that data by source, and incorporated it into a commercial product.

Defendant's own public description confirms the point. Its "About" page states that "Intelligence X differentiates itself from other search engines" by "search[ing] in places such as the darknet, document-sharing platforms, whois data, public data leaks and others," and by "keep[ing] a historical data archive of results, similar to how the Wayback Machine from archive.org stores historical copies of websites." (*Intelligence X Is a Search Engine and Data Archive*, Intelligence X, https://intelx.io/about (last visited August 6, 2026).) In short, IntelX does not merely make existing public webpages searchable. It collects from specialized, difficult-to-reach sources (including the darknet), preserves historical copies, and continues making data available through paid products even after the original source removes it. That is materially different from Google-style indexing of ordinary public webpages.

Defendant's buckets further demonstrate the point. Defendant's corporate representative testified that the "web crawler or web crawlers are designed to scrape information that falls into these buckets." Agarwal Cert. Ex. B. (Holcomb Dep. Tr.), at 66:24–67:10. They are not passive categories that organize data after collection; they inform collection.

Among the buckets containing "important categories of [] information available on [] the Internet," id. at 65:7–65:17, Defendant identified:

- "web.public.ams"—a bucket that indexes public web content from domains including ".us," the United States country-code top-level domain.
- "web.public.gov"—a bucket that *specifically* indexes U.S. government websites using the ".gov" top-level domain. The description for this bucket is "Public Web: U.S. Government."
- "whois"—a bucket indexing WHOIS data.

Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 6.)

Defendant was knowingly and intentionally scraping personal data from U.S. top-level domains, which necessarily included the home addresses and phone numbers of New Jersey residents. Indeed, Defendant's indexing system contained the personal information of New Jersey residents, including Covered Persons. Agarwal Cert. Ex. C (IntelX Search Result).[2]

Defendant also curated that same dataset into multiple paid products. IntelX and Identity Portal use the same underlying dataset, but Identity Portal "processes and visualizes it with a different user interface." Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 1.) Critically, the website is the product: customers purchase the right to use Defendant's website to search Defendant's database, and the website is the means by which Defendant delivers access to New Jersey

[2] Defendant claims that it is not possible for it to verify whether New Jersey home addresses or telephone numbers are contained in its database because "Defendant does not know the home telephone number of any New Jersey resident and therefore cannot definitively ascertain whether any such telephone number is available via the search engine." Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 1.) Defendant collects data from U.S. websites and domains, and Defendant did not state that it *excluded* from its collection data on New Jersey residents. Agarwal Cert. Ex. B (Holcomb Dep. Tr.), at 62:15-63:9. Moreover, Plaintiffs attach as Exhibit C to their brief a sampling of New Jersey data retrieved from Defendant's database, which includes the Protected Information of Detective Patrick Colligan of the Franklin Township police department in Somerset, New Jersey. Accordingly, all facts support that Defendant collected data on New Jersey residents and retains it in its database.

residents' personal information. The existence of two paid interfaces shows that Defendant deliberately repackages the same dataset for different customer use cases.

### D. Defendant Pays a Third Party for Contact-Information Data

Defendant also pays for data. It subscribes to [redacted] for approximately $50 per month for aggregated WHOIS data. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 5). WHOIS data is a source of domain registrant contact information that includes email addresses and telephone numbers.[3] Defendant's corporate representative testified that "Kleissner Investments aim[ed] to undertake a thorough collection of publicly available data" and "determined that that information could be efficiently provided by a vendor" and so Defendant "identified the vendor that [] it did to provide that data." Agarwal Cert. Ex. B. (Holcomb Dep. Tr.), at 71:14–23. Defendant does not merely collect personal information through passive web crawling; it pays a vendor monthly for a structured source of personal data. Nor is WHOIS data marginal to Defendant's architecture: Defendant created an entire bucket for it. In sum, Defendant affirmatively paid for contact-information data, organized it as its own source category, and incorporated it into the IntelX and Identity Portal datasets.

## ARGUMENT

## I. THE COURT HAS SPECIFIC PERSONAL JURISDICTION OVER DEFENDANT

Specific personal jurisdiction turns on three questions. *First*, Plaintiffs must show that Defendant took "some act by which it purposefully avails itself of the privilege of conducting

[3] The monthly subscription plan includes [redacted]

activities within the forum State." Ford Motor Co. v. Montana Eighth Judicial Dist. Ct., 592 U.S. 351, 359 (2021) (cleaned up). *Second*, Plaintiffs' claims must "arise out of or relate to" Defendant's forum contacts. Id. (internal citation omitted). *Third*, if those requirements are met, "the burden shifts to the defendant, who must show that the assertion of jurisdiction would be unreasonable." Ameripay, LLC v. Ameripay Payroll, Ltd., 334 F. Supp. 2d 629, 633 (D.N.J. 2004) (citing Mellon Bank (East) PSFS v. Farino, 960 F.2d 1217, 1226 (3d Cir. 1992)).

**A. Defendant Purposefully Availed Itself of New Jersey**

Minimum contacts exist when "the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." Venuto v. Atlantis Motor Group, LLC, CV 17-3363 (RBK/KMW), 2018 WL 2134035, at *3 (D.N.J. May 9, 2018). The essential question is whether Defendant purposefully availed itself of the privilege of conducting activities in New Jersey, thereby invoking the benefits and protections of its laws. Put another way, the relevant inquiry is whether Defendant's conduct and connection with New Jersey are such that it "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

This Court applied that standard in Quantarium Alliance and held that data broker defendants purposefully availed themselves of the New Jersey market where they, "as part of their business, gather[ed] information including home addresses and/or unlisted telephone numbers of New Jersey residents" and "obtain[ed] the information at least in part by paying third parties for it." 2026 WL 765716, at *7. Those defendants then sold or made available information about New Jersey residents to website users, including users in New Jersey. Id. at *7.

Jurisdictional discovery revealed that Defendant does the same thing.

**<u>Collection and Commoditization of New Jersey Data.</u>** Defendant generates revenue by selling access to personal information, including the personal information of New Jersey residents. Unlike Google, which indexes ordinary public webpages, Defendant collects from specialized, difficult-to-reach sources—darknet repositories, document-sharing platforms, WhoIs data, and public data leaks—and organizes them into purpose-built buckets. (*Intelligence X Is a Search Engine and Data Archive*, *supra*; Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 6).) Critically, those buckets include U.S.-specific top-level domains: "web.public.ams" indexes the ".us" country-code domain, and "web.public.gov" is described as "Public Web: U.S. Government." Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 6.) Defendant's corporate representative testified that the "web crawler or web crawlers are designed to scrape information that falls into these buckets." Agarwal Cert. Ex. B (Holcomb Dep. Tr.), at 66:24–67:10. The implication is clear: Defendant's web crawler capability is designed, in part, to search U.S. domains, knowingly and intentionally collecting U.S. data—and within Defendant's database is in fact the data of New Jersey residents. Agarwal Cert. Ex. C (IntelX Search Result). That intentionally collected data then becomes a product. Defendant's own "About" page confirms that IntelX "differentiates itself from other search engines" by searching those specialized sources and maintaining a historical archive that preserves data even after the original source removes it. (*Intelligence X Is a Search Engine and Data Archive*, *supra*.) And Defendant monetizes that data by repackaging the exact same dataset into two paid products—IntelX and Identity Portal—each presenting the data with a different interface and sold at different rates under different license tiers. (*Product*, Intelligence X, <u>https://intelx.io/product</u> (last visited August 6, 2026); Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 1).) The bucket architecture, historical archiving, and multi-product curation show that Defendant knew what data it had, organized it deliberately, and commercialized it.

**Purchase of New Jersey Data from a Third-Party Seller.** Like the Quantarium Alliance defendants, Defendant does not acquire data only from publicly available sources. It pays a third-party vendor approximately $50 per month for aggregated WHOIS data—a source of domain registrant contact information such as email addresses and telephone numbers. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 5.) Defendant's corporate representative explained that Defendant chose to pay for this data because it "could be efficiently provided by a vendor." Agarwal Cert. Ex. B (Holcomb Dep. Tr.), at 71:14–23. The only reasonable inference is that this data either could not be collected by Defendant's own web crawler(s), or that Defendant calculated it was more efficient to pay a vendor than to crawl for it. Either way, Defendant made a deliberate business decision to purchase personal data. Defendant therefore "obtain[s] the information at least in part by paying third parties for it." Quantarium Alliance, 2026 WL 765716, at *7.

**Defendant Makes New Jersey Data Available to New Jersey Customers.** Defendant sells access to New Jersey data to paying New Jersey customers—three end-user licensees that generated approximately [redacted] in fees in 2024 and 2025. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 2.) Defendant's New Jersey sales were not one-off website visits or isolated transactions. They were multi-year commercial relationships with established New Jersey businesses with New Jersey billing addresses—not random individuals paying to use the site for a day or to run a single search. Defendant sold year-long IntelX subscriptions to New Jersey customers for at least [redacted] each, and those subscriptions were renewed or expanded. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 2.) These contacts cannot reasonably be characterized as "random, fortuitous, or attenuated." See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (cleaned up).

**<u>Defendant Engages a New Jersey Reseller.</u>** Defendant's reseller relationship with [redacted]—a global IT solutions provider headquartered in New Jersey—is an independent and substantial forum contact. This is not a case where a foreign website operator passively waited for unknown users to arrive from anywhere in the world. Defendant entered into an ongoing commercial relationship with a New Jersey company to sell its product, and [redacted] resold Defendant's licenses in both 2024 and 2025. Agarwal Cert. Ex. A (Def. Interrog. Resp. No. 2.) Critically, this is not a mere affiliate arrangement directing customers to a website. [redacted] itself purchases licenses directly from Defendant and pays the same fees that direct customers pay through the website—full price for each license. Agarwal Cert. Ex. B (Holcomb Dep. Tr.), at 96:13–98:17. "[redacted] pays Kleissner Investments directly for the licenses that it then resells." Id. at 97:25–98:2. Through this New Jersey-based sales channel, Defendant earned approximately [redacted] in 2024 and [redacted] in 2025—a total of approximately [redacted] flowing through the State of New Jersey. Id. at 100:3–100:15. The location of [redacted]'s downstream customers does not erase the forum contact: Defendant deliberately used a New Jersey entity as a sales channel, accepted the benefits of that relationship, and generated substantial revenue from it. Defendant cannot disclaim direction toward New Jersey while simultaneously choosing a New Jersey-headquartered company to help sell its product.

The contrast with Quantarium Alliance's treatment of True Software Scandinavia AB ("True Software")—the only defendant dismissed from the case—is instructive. True Software was dismissed because it "[did] not possess except possibly in very rare instances any information on covered persons under Daniel's Law" and did not "offer [its product] to New Jersey residents." 2026 WL 765716, at *8. Defendant is the opposite. True Software's database captured a New Jersey number—or any U.S. number—only if a New Jersey or U.S. caller happened to contact a European product user and that call was flagged as potential spam. Id. at *4. True Software then

would have recorded that call log in its European database. Id. Defendant, by contrast, targets U.S. top-level domains and organizes U.S.-level data into dedicated buckets, includes New Jersey data in its database, pays for WHOIS contact-information data from a third party, sold access to its data products to New Jersey customers, and sold licenses to a New Jersey-headquartered reseller. If Quantarium Alliance draws a line between data brokers subject to personal jurisdiction in New Jersey and those beyond this Court's reach, Defendant falls squarely within the category of data brokers subject to this Court's jurisdiction.

Quantarium Alliance also answers Defendant's exaggerated "universal jurisdiction" objection—that exercising jurisdiction here would "effectively require a finding imputing knowledge of *all data on the internet* to Defendant." (Def. Reply at 5, ECF No. 36) (emphasis in original.) That is not Plaintiffs' theory, and it is not what this Court held in Quantarium Alliance. The "universal jurisdiction" concern describes the case Defendant wishes this were: a mere-accessibility case, or a True Software case, where the defendant's database might incidentally capture New Jersey data only because a New Jersey resident happened to contact a foreign user of the product, and no New Jersey customer ever directly purchased access to the product from the defendant. Quantarium Alliance held that such facts were not enough. But it also held that "something more" exists where a data broker collects New Jersey residents' information, obtains information at least in part by paying third parties, and has *actually* made that information available to New Jersey users. That is this case. Defendant has New Jersey data in its database, pays a third party monthly for WHOIS contact-information data that necessarily includes U.S. and New Jersey data at scale, has a website accessible in New Jersey, sold year-long subscriptions to established New Jersey customers over multiple years, and generated substantial revenue by selling licenses to a New Jersey reseller for resale. Those facts do not raise the specter of universal jurisdiction.

They establish specific jurisdiction over a defendant that deliberately collected, organized, commercialized, and sold access to data from and in New Jersey.

Nor can Defendant avoid jurisdiction by asserting that it did not appreciate that its customers—or its data—were connected to New Jersey. Defendant attempts to distinguish Quantarium Alliance by arguing that Plaintiffs lack evidence that Defendant was "aware that its search engine was revealing New Jersey information or that it had New Jersey customers." (Def. Reply at 4-5, ECF No. 36.) But Quantarium Alliance did not turn on a defendant's claimed subjective awareness of each forum contact. The relevant facts are in Defendant's own business records: customer names, license records, renewal history, payment information, and license sales to [redacted], a New Jersey-headquartered company. Those customers were not anonymous individuals running a single search; they were established businesses purchasing annual licenses. Defendant cannot ignore what its own records show and then invoke that asserted ignorance to defeat purposeful availment. Furthermore, Defendant cannot claim surprise that it possessed New Jersey data while deliberately searching U.S. top-level domains, maintaining U.S.-level buckets, and paying a third party monthly for WHOIS contact-information data that necessarily includes U.S.-based domain registrants. This is not a True Software scenario; Defendant created buckets for U.S. data and purchased data known to include U.S.-based domain registrants. Purposeful availment turns on Defendant's deliberate commercial conduct—selling subscriptions to forum-state customers, selling licenses to a forum-state reseller, organizing and purchasing U.S. data, and accepting the benefits of those relationships—not on Defendant's after-the-fact assertion that it did not subjectively intend to serve New Jersey. See Burger King, 471 U.S. at 475–76; Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 452 (3d Cir. 2003).

### B. Plaintiffs' Claims Arise Out of or Relate to Defendant's Forum Contacts

The minimum contacts requirement is satisfied because Plaintiffs' claims arise directly from—and are inseparable from—Defendant's New Jersey contacts. The alleged injury stems from Protected Information about New Jersey Covered Persons that Defendant collected, archived, and made available through its platform to New Jersey customers. The website and products at issue are therefore not incidental conduits for unrelated transactions; they are the means by which Defendant's New Jersey-directed harm occurred.

Defendant's attempt to analogize this case to the facts of Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446 (3d Cir. 2003), and Hasson v. FullStory, Inc., 114 F.4th 181 (3d Cir. 2024), misses the mark. Those cases involved forum contacts that were separate from, or insufficiently related to, the conduct giving rise to the plaintiffs' claims. Here, by contrast, the forum contacts are the product: Defendant's collection, organization, and sale of New Jersey residents' personal information; and the sale of the product to New Jersey customers. As this Court explained in Quantarium Alliance, the data-broker websites "contain and directly make available the defendants' product—the personal information about New Jersey residents to New Jersey residents and to others." 2026 WL 765716, at *8.

### C. Exercising Jurisdiction Would Not Offend Traditional Notions of Fair Play and Substantial Justice

Once minimum contacts are established, the burden shifts to Defendant to show that the assertion of jurisdiction would be unreasonable. Ameripay, 334 F. Supp. 2d at 633. Defendant cannot meet that burden here.

New Jersey has an overwhelming interest in protecting Covered Persons—active and retired judges, law enforcement officers, prosecutors, and their families—from the disclosure of

their home addresses and telephone numbers. Daniel's Law was enacted to address the unique dangers those individuals face.[4] The State's interest in adjudicating claims under its own protective statute is at its apex. Indeed, "a violation [of Daniel's Law] not only infringes on the privacy of covered persons but also undermines the policy of New Jersey to enhance the safety and security of covered persons and to foster their ability to carry out their official duties as part of the justice system without fear of personal reprisal." Quantarium All., LLC, 2026 WL 765716, at *8 (D.N.J. Mar. 18, 2026).[5]

Defendant's forum contacts were neither accidental nor burdensome to defend. Defendant entered the New Jersey markets by collecting and commoditizing New Jersey data, maintaining multi-year subscription relationships with established New Jersey customers, and selling licenses to a New Jersey-headquartered reseller for resale. Having built a business that monetizes U.S. and New Jersey residents' personal data through paid products, Defendant cannot credibly contend that litigating in New Jersey offends traditional notions of fair play and substantial justice. Any practical burden is modest: Defendant conducts business in English, has retained local counsel, has participated in jurisdictional discovery, and produced a corporate witness for an in-person deposition in New York.

---

[4] "Daniel's Law serves a state interest of the highest order." Kratovil v. City of New Brunswick, 261 N.J. 1, 25, 336 A.3d 201, 216 (2025).

[5] "New Jersey has a compelling interest in adjudicating claims arising under Daniel's Law, which protects the safety and privacy of its public officials and their families. Plaintiffs, as New Jersey residents, would be greatly burdened by cross-country travel." Atlas Data Priv. Corp. v. Constella Intelligence, Inc., No. ESX-L-7212-24, Tr. I.D. LCV20261285271 (Law Div. May 12, 2026), at 7.

## CONCLUSION

For the foregoing reasons, the Court has specific personal jurisdiction over Defendant. Discovery confirmed purposeful availment through Defendant's organization and purchase of U.S. data, its sale of access to New Jersey customers, and its sale of licenses to a major New Jersey-headquartered reseller. Plaintiffs' claims arise directly from Defendant's New Jersey-directed conduct—collecting, archiving, and selling access to New Jersey residents' personal data. Consistent with Quantarium Alliance, the Court should deny Defendant's motion to dismiss for lack of personal jurisdiction.

Dated: August 6, 2026

Respectfully submitted,

**FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP**

*Attorneys for Plaintiffs*

/s/ *Rahul Agarwal*
RAHUL AGARWAL